UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALLIED WASTE NORTH AMERICA, LLC AND 623 LANDFILL, INC., <br><br> PLAINTIFFS, <br><br> V. <br><br> INTERNATIONAL BROTHERHOOD OF TEAMSTERS, LOCAL 25, THOMAS G. MARI, INDIVIDUALLY AND AS PRESIDENT, STEVEN J. SOUTH, AS SECRETARY-TREASURER, JOAN C. COREY, AS VICE PRESIDENT/ BUSINESS AGENT, PETER S. BERRY, AS RECORDING SECRETARY, MILTON DEPINA, INDIVIDUALLY AND AS UNION REPRESENTATIVE, NICO CATANO, INDIVIDUALLY AND AS UNION TRUSTEE, DAVID SMITH, INDIVIDUALLY AND AS UNION REPRESENTATIVE, ERIC LOGAN, INDIVIDUALLY AND AS UNION REPRESENTATIVE, BRIAN J. HATCH, INDIVIDUALLY AND AS BUSINESS AGENT, <br><br> AND <br><br> JOHN DOES 1-100; AND ALL OTHERS CONSPIRING, ACTING IN CONCERT, OR OTHERWISE PARTICIPATING WITH THEM OR ACTING IN THEIR AID OR BEHALF, <br><br> DEFENDANTS. | CIVIL ACTION NO. |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'MOTION FOR TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION

### I.    INTRODUCTION

On July 10, 2025, Plaintiffs' roll-off waste collection truck was stolen from a Roxbury transfer station. This theft was captured on video. This incident followed closely on the heels of Defendants' 10-day, unlawful, violent, strike activities—which have not abated and are continuing. Plaintiffs are in need of immediate relief via a temporary restraining order, and a preliminary injunction.

On July 1, 2025, after expiration on June 30 of its collective bargaining agreement with Plaintiff Allied Waste North America, LLC ("Allied"), Defendant International Brotherhood of Teamsters, Local 25 ("Local 25" or the "Union"), a labor union representing a bargaining unit of

1

Allied's employees (the "Unit"), commenced a strike against Allied.[1] Since shortly after midnight on July 1, Local 25, in concert with its officers, trustees, representatives, Unit members, and others (collectively, with Local 25, the "Defendants"), has been engaged in picketing at Allied's facilities in the Boston area, including hubs in Revere, Peabody, Roxbury and Holbrook, the sites of Allied's customers, the sites of Plaintiff 623 Landfill, Inc. (Plaintiffs collectively referred to as "Republic"), and other Massachusetts locations of Republic[2], in an attempt to force Republic to accede to Local 25's collective bargaining demands. This case is about the manner of Defendants' picketing and other strike-related actions, which have, in an understatement, been anything but peaceful.

As described in Republic's Verified Complaint, throughout the strike Defendants have been deliberately engaged in a vicious and malicious campaign, by unlawful means, to destroy Republic's business, and prevent Republic's employees from working. Defendants have put Republic employees, and the general public, in danger through their conduct. Defendants' conduct includes violent acts, vandalizing vehicles, blocking ingress and egress to Republic's facilities and those of its customers, following Republic drivers and trying to run them off the road and/or cause traffic accidents, threatening acts of sexual assault against employees' family members, and screaming discriminatory and harassing racial slurs and homophobic epithets at Republic employees. This conduct has escalated to a fever pitch—on July 10, 2025, a Republic truck was stolen from a Boston transfer station—and continues to date. Local 25, however, is only beginning, as its President Thomas Mari yelled through a bullhorn on July 6, 2025, "**[i]t's only going to get worse . . . we are going to ramp it up, you haven't seen anything yet.**" Affidavit of K. Runge ("Runge Aff.") ¶ 5.

The Court should immediately issue a temporary restraining order and schedule a hearing as soon as possible to preliminarily enjoin Defendants' wrongful conduct. Injunctive relief is appropriate because: 1) Plaintiffs are likely to succeed on the merits of their claims; 2) the Norris-

---

[1] The bargaining unit is comprised of commercial and residential truck drivers, mechanics, repairers, operators, helpers and specialty drivers.

[2] The Peabody locations are part of Business Unit ("BU") 143, which is operated as JRM Hauling and Recycling Services, LLC, which is wholly owned by 623 Landfill, Inc. Lavery Aff. ¶¶ 2, 4. The Revere Facility, the Roxbury Facility, and the Holbrook Facility are part of BU 141, which is operated as Allied Waste Services of Massachusetts, LLC and is wholly owned by Allied Waste North America, LLC. *Id.* ¶¶ 2, 5. Allied Waste North America, LLC and 523 Landfill, Inc. ultimately share the same corporate parent. *Id.* ¶ 2.

LaGuardia Act does not bar an injunction prohibiting Local 25s unlawful and coercive conduct; 3) Republic is suffering, and will continue to suffer, irreparable harm and has no adequate remedy at law; 4) the benefit to Republic of the injunction outweighs the detriment to the Union; and 5) law enforcement has been unable to devote sufficient resources to control the Union's violent attacks.

Republic is in need of immediate injunctive relief to protect the safety of its employees and the public, ensure the continuity of its business operations, and maintain the public health and welfare.

## II.    FACTS

### A.    Republic's Business and Local Facilities.

Republic provides waste collection, removal, and disposal services to commercial and residential customers throughout Massachusetts, including by and through its contracts with state and federal public entities, municipalities, and private companies. Affidavit of Kurt Lavery ("Lavery Aff."), ¶ 3. Through these contracts, Republic services about 400,000 customers in Massachusetts. *Id.*

Republic has facilities located at 109 Newbury Street, Peabody, Massachusetts ("Peabody Recycling Facility"), 300 Forest Street, Peabody, Massachusetts ("Peabody Transfer Station"), 277 Newbury Street, Peabody, Massachusetts ("Peabody Hauling Facility"), 320 Charger Street, Revere Massachusetts ("Revere Facility"), 66 Norfolk Avenue, Roxbury, Massachusetts ("Roxbury Facility"), 300 Centre Street, Holbrook, Massachusetts ("Holbrook Facility") and 22 Nightingale Avenue, Quincy, Massachusetts ("Quincy Facility"), as well as facilities at other locations in Massachusetts. *Id.* ¶¶ 4-5. These facilities serve as Republic employees' bases of operation. Republic employees travel to a host of locations from these bases of operation, to perform waste removal and disposal services for residential and commercial customers. *Id.* ¶ 12.

### B.    The Labor Dispute.

The parties engaged in bargaining a successor contract, beginning April 19, 2025. Lavery Aff. ¶ 13. To date, the parties have had approximately ten bargaining sessions to try to reach agreement on new contract terms. *Id.* The parties have been unable to reach agreement, to date. *Id.* The Union's position at the bargaining table was simply "you have until June 30." *Id.* On July 2 and 11, the parties engaged and met with a federal mediator. *Id.* ¶ 14. The federal mediator was unable

to secure an agreement. *Id.* Beginning on July 1, 2025, Local 25 began the strike in which it is currently engaged. *Id.*

### C. The Union's Unlawful Conduct.[3]

On July 10, 2025, at approximately 4:35 a.m., a Republic roll-off truck was stolen when the driver exited the cab to check in with the scale house attendant at a transfer station located at 440 Rutherford Ave, Roxbury, MA. The stolen truck was located in an adjacent parking lot shortly after it sped from the vendor site. None of the contents of the truck were missing. Plaintiffs' trucks require specialized knowledge to operate, therefore only an experienced driver would likely be able to steal a vehicle in this manner. The fact that the thief exited through a back entrance, suggests that the thief was someone familiar with the layout of this vendor location. This incident came only days after Local 25 President, Thomas Mari yelled at Republic General Manager Kenny Runge, words to the effect of "[y]ou think this is bad? Wait until we ramp it up," Runge Aff. ¶ 4, and after the series of unlawful picket activities.

The strike began with picketing at various locations, including the Peabody Hauling Facility and the Revere Facility, but has since expanded to four additional locations. *Id.* The Union's misconduct has not abated, and has escalated throughout the strike. *Id.*

#### a.    The Union's Violence

The strike started with violent activity at Republic's Revere Facility. Lavery Aff. ¶ 16; Affidavit of Erick Martinez ("Martinez Aff.") ¶ 3; Affidavit of Joe Thibault ("Thibault Aff.") ¶ 3. On July 1, 2025, at approximately 2:00 a.m., a convoy of one lead vehicle, and three passenger vehicles containing approximately forty non-striking workers and members of management, attempted to enter the Revere Facility to conduct business operations. Lavery Aff. ¶ 16; Martinez Aff. ¶ 3. Area Security Manager Jeff Swagger and Area Vice President Kurt Lavery were in the lead vehicle. Lavery Aff. ¶ 16; ("Swagger Aff.") ¶ 3. Swagger, Lavery and others attest to what can only be described as a vicious, angry, mob of picketers attacking their vehicle. *See* Lavery Aff. ¶¶ 17-20; Martinez Aff. ¶ 4; Swagger Aff. ¶¶ 3-6. The picketers beat on the outside of Swagger's rental car

---

[3] The incidents summarized below are just a few examples of Defendants' violent misconduct. The affidavits attached to this memorandum provide a more complete view of the context of this strike.

with flashlights and fists, and blocked the vehicles from moving. Lavery Aff. ¶ 19; Martinez Aff. ¶¶ 4-6; Swagger Aff. ¶4. The picketers yelled angry threats and vulgar language at the car, identifying Lavery by name and indicating "[f]uck around and find out," and "why doesn't Kurt step out of the car, handle business man-to- man." Lavery Aff. ¶ 17; Swagger Aff. ¶ 4. Union Field Representative Eric Logan encouraged the melee, pointing out Lavery to the angry crowd. Lavery Aff. ¶ 17. Logan also participated in the harassment of the caravan, and directed the picketers. Affidavit of Timothy Reece ("Reece Aff.") ¶¶ 4-5. The picketers yelled, used a bullhorn, and flashed strobe lights in Swagger's face, obstructing his vision. Lavery Aff. ¶ 19; Swagger Aff. ¶ 4. Both men were afraid the windows might be broken and that Lavery might be dragged from the vehicle. Lavery Aff. ¶ 19; Swagger Aff. ¶ 4. The picketers damaged Swagger's rental car, keying both sides. Swagger Aff. ¶ 5.

Just behind the rental car were three passenger vans driven by Republic managers and carrying approximately 40 non-striking workers. *See* Martinez Aff. ¶ 3; Swagger Aff. ¶ 3. Those vans experienced the same threatening behavior. *See* Martinez Aff. ¶¶ 4-6; Reece Aff. ¶¶ 4-6; Affidavit of Luis Chamorro ("Chamorro Aff.") ¶ 3; Thibault Aff. ¶ 3. The violent mob rocked the vans back and forth. Thibault Aff. ¶ 3. At one point a picketer, later identified as Local 25 Business Agent Brian J. Hatch, produced a knife and proceeded to flatten one tire on the first van, and one tire on the second van. Martinez Aff. ¶ 5; Chamorro Aff. ¶ 4; Martinez Supp. Aff. ¶ 4. All told, the three vans and their passengers were trapped in the angry mob for up to three hours. Lavery Aff. ¶ 22; Martinez Aff. ¶ 5; Chamorro Aff. ¶ 4. Defendants placed a "make shift" barricade in front of the third van, comprised of buckets and two-by-four timber. Reece Aff. ¶ 6. The Revere police were present and took no immediate action to remove the barricade. *Id.*

Nico Catano, an individual identified on Local 25's website under "leadership" as a Trustee, perpetuated the conduct himself. On July 1, Catano approached manager Chris Mitchell's car at the Revere Facility, leaned in the window, and screamed a variety of threatening terms, including "shut the fuck up you fucking maggot," "fuck you, you fucking piece of shit," and similar comments. Affidavit of C. Mitchell ("Mitchell Aff.") ¶ 3. Catano's face was inches from Mitchell's and Mitchell could feel Catano's spittle deposited on his arm, neck and face. *Id.*

The same violent conduct continued the following day, at the Peabody Hauling Facility. Martinez Aff. ¶ 11. Affidavit of Ted Spinale ("Spinale Aff.") ¶ 11. On July 2, 2025, picketers surrounded supervisor Eric Martinez' passenger van yelling "come out and fight" and "let's meet over at the Cumberland Farms." Martinez Aff. ¶ 11. Defendant Milton DePina, a Local 25 Field Representative, was present and did nothing to intervene. Reece Aff. ¶ 9. Rather, DePina was screaming profanities at non-striking employees through a bullhorn, and riling up picketers. *Id.* DePina was also telling picketers not to let Republic's vehicles pass. *Id.*

On July 4, 2025, Local 25 picketers surrounded Luis Chamorro's truck at a vendor's site and yelled "come out" and "we are waiting for you outside," in a menacing tone. Chamorro ¶ 8. Picketers wearing Teamster insignia climbed onto the truck cab and sprayed Chamorro with window cleaner, in an apparent attempt to disable him. *Id.* The conduct did not abate, and similar conduct followed on July 7 when Swagger attempted to enter the Roxbury Facility. Swagger Aff. ¶ 10. Swagger's three-vehicle convoy was again stopped and mobbed by picketers, screaming and blocking the vehicles' ingress. *Id.* ¶¶ 10-11. The crowd, holding Teamster signs and wearing Teamster insignia, physically beat the vehicles with their fists, yelled at the occupants, flashed strobes in Swagger's eyes and yelled vulgar homophobic slurs like "faggot." *Id.* A truck attempting to exit the Roxbury Facility was likewise mobbed, blocked, and ultimately vandalized. *Id.* ¶ 14. On July 8, 2025, Local 25 President Thomas Mari was at the Holbrook Facility screaming, agitating and encouraging the picketers to stop Republic vehicles. Runge Aff. ¶ 7.

On July 9, 2025 at the Holbrook Facility, a Teamster on the picket line using a bullhorn, called Area Director of Operations Support Zimu Cao a "fucking chink," and screamed at Senior Manager of Hauling Operations Jennifer Johnson, "[i]t's funny that the trash's cans smell better than your rotten pussy, you cunt!" Affidavit of Jennifer Johnson ("Johnson Aff.") ¶¶ 4-5. The police were on site and did not intervene. *Id.*

Today, July 14, 2025 at the Revere Facility, individual defendant and Local 25 Business Agent Brian Hatch spit in the face of a Pinkerton security guard in the presence of Revere Police officers who did not intervene. Affidavit of Mark Niboh ("Niboh Aff."), ¶ 8; Martinez Supp. Aff. ¶ 4.

      b.    <u>The Union's threats of Physical Harm and Sexual Assault</u>

Local 25 picketers have made overt physical threats and thinly veiled threats of sexual assault towards Republic non-striking workers. On July 2, 2025, Defendant Catano directly threatened a Republic Operations Manager, Joe Ganno, by screaming at him: "Get out of the car, I'm going to fuck you up" and then "I'm going to beat you up, you are a piece of shit." Affidavit of Joseph Ganno ("Ganno Aff.") ¶ 4. On July 2, 2025, picketers surrounded Martinez' passenger van with non-striking workers inside, yelling "come out and fight." Martinez Aff. ¶ 11. On July 4, 2025, Local 25 picketers surrounded Chamorro's truck at a vendor's site and yelled "come out" and "we are waiting for you outside," in a menacing tone. Chamorro Aff. ¶ 8. On Saturday, July 5, Republic replacement driver Adam MacInnis was driving a vehicle with "Tyngsboro" on the side. Affidavit of Adam MacInnis ("MacInnis Aff.") ¶ 17. Union picketers followed him on his route, trapped him at a customer apartment complex, yelling "I know where Tyngsboro is, I'll see you in fucking Tyngsboro faggot!" *Id.* ¶¶ 15-17. On July 7, a picketer screamed at driver Noble Hanley, "I don't want to do violence on you, but I will." Affidavit of Noble Hanley ("Hanley Aff.") ¶ 5.

Local 25 picketers have also engaged in numerous threats relating to past and future sexual assault. On July 1, 2025, a picketer at the Revere Facility screamed at Republic General Manager Trainee Ché Erickson that he intended to "fuck" her mother, and "fuck" her wife. Affidavit of Ché Erickson ("Erickson Aff.") ¶ 6. On July 2, 2025, picketers surrounded Joe Thibault's truck, yelling "I got your girlfriend in a barn," "one of the Teamsters is doing your mother." Thibault Aff. ¶ 4. On July 3, 2025, picketers screamed at Chamorro, "your wife is getting fucked by a union guy right now." Chamorro Aff. ¶ 6. On July 4, 2025, picketers yelled to non-striking workers, within earshot of Spinale, "while you are here there is a Teamster at home cumming all over your wife's face." Spinale Aff. ¶ 6. On July 7, 2025, a picketer screamed at a female employee "[y]ou can't reach the steering wheel? I got a couple of inches for you!" Erickson Aff. ¶ 13.

      c.    <u>The Union Blocks Ingress and Egress and Halts Operations</u>

Local 25 has engaged in conduct that blocks ingress to and egress from Republic's facilities and deprives Republic of the use of its property to operate its business. Lavery Aff. ¶ 24. As noted above, on July 1, 2025, Defendants blocked all ingress to the Revere Facility for three hours.

Lavery Aff. ¶ 22; Martinez Aff. ¶ 5; Chamorro Aff. ¶ 4. Thereafter, trucks were delayed so long in attempting to get out of the Revere Facility that business basically stopped. All other locations remained closed July 1. Lavery Aff. ¶¶ 29-30. The Holbrook and Quincy facilities were closed from July 1, 2025 to July 7, 2025. *Id.* The Revere Facility opened for one day only, July 1, 2025, and has remained closed since due to the extreme violence at that site. *Id.*

On July 1, 2025, Defendants jumped on the first truck exiting the Revere facility. Martinez Aff. ¶ 8. The picketers physically swarmed and mobbed the truck, they pulled the air hoses out of place, disabling the truck in the exit way, disconnected the battery line, and disabled the air brake line. *Id.* ¶ 8. On July 2, 2025, a picketer blocked a Republic truck from exiting a customer location in Quincy. MacInnis Aff. ¶¶ 6-10. On July 3, 2025, 20 picketers surrounded a Republic truck at a customer site and, for 2 hours, blocked it from accessing the waste container. Chamorro Aff. ¶¶ 5-7. On July 5, 2025, a group of picketers surrounded a Republic truck on Chesterton Street in Boston, and prevented the driver from exiting for 2 hours. *Id.* ¶ 9. On July 7, 2025, a group of picketers surrounded a Republic truck and blocked the driver from getting into a customer site. Hanley Aff. ¶¶ 3-6. On July 8, 2025, a picketer placed a combination padlock on the main gate at the Revere Hauling site. Supplemental Affidavit of Jeff Swagger ("Swagger Sup. Aff.") ¶¶ 4-7. This prevented routine and emergency egress. *Id.*

As of July 8, 2025, the police made an agreement with picketers and were requiring each Republic truck leaving the Peabody Hauling Facility and the Peabody Recycling Facility to wait 7 minutes before leaving. Swagger Aff. ¶ 23. At the Roxbury Facility, picketers and police allow trucks to leave every 13 minutes, and required them to wait 13 minutes coming into the yard (a 26-minute waiting time). *Id.* Republic has not been able to run trucks out of the Revere Facility since July 1, but has been informed that if trucks did start running from Revere, the police and picketers would block each truck for 15 minutes before leaving, and 15 minutes before re-entering. *Id.*

        d.    <u>The Union has Engaged in Extreme Acts of Vandalism</u>

Local 25 picketers have engaged in extreme, sanctioned, vandalism. Picketers "keyed" down both sides of the rental car leading the convoy into the Revere Facility on July 1, 2025. Swagger Aff. ¶ 5. Even more alarming, a picketer produced a knife, and slashed and flattened the tires of

passenger vans at the Revere Facility while the occupants of the vans looked on in distress. Martinez Aff. ¶ 5; Chamorro Aff. ¶ 4. This conduct happened in full view of Logan. Lavery Aff. ¶ 17. Most recently, on July 10, 2025, a Republic truck was stolen from a third-party transfer station in Boston. Supplemental Affidavit of Charles "Toby" Staats ("Staats Sup. Aff."), ¶¶ 10-13.

Likewise on July 1, at the Revere facility, picketers mobbed and disabled the first several trucks attempting to leave the facility, by turning off the batteries and opening the air brake valves. Martinez Aff. ¶ 8. On July 2, 2025, picketers surrounded driver Joe Thibault's, blocking his path, opening his hood, and opening his air brake valve to disable the vehicle. Thibault Aff. ¶ 4. On July 5, 2025, picketers blocked MacInnis then walked to the side of this truck and disconnected the air brakes and battery cable. MacInnis Aff. ¶ 16. On July 7, 2025, picketers mobbed and physically disabled the first truck attempting to leave the Roxbury Facility. Swagger Aff. ¶ 14.

Even more concerning, on July 7, 2025, picketers surrounded a Republic driver on Gerard Street, and a female picketer tore off the truck's DEF cap and unscrewed the fuel tank lid. Swagger Aff. ¶ 16. The same female picketer put a cigar into the driver's fuel tank and sabotaged the truck's headlights. *Id.* She then continued to unclasp the battery box on another Republic truck. *Id.* ¶ 19. When Swagger identified her to a Boston police officer and requested to press charges, the officer simply responded he should "file a report" later. *Id.* ¶ 17.

e.    Picketers Have Engaged in Vulgar Harassment and Discrimination.

Perhaps the most shocking example of Local 25s harassing conduct were picketers racist remarks to non-striking workers of color driving off the Peabody Hauling Facility. Erickson witnessed a picketer with a bullhorn remark to a driver of color "Hey you fucking n****r, that's my truck!" and "Whites only!" Erickson Aff. ¶ 12. Cao was called a "fucking chink" and Johnson was told the trash smelled better "than your rotten pussy, you cunt." Johnson Aff. ¶ 4 and attached video. Republic non-striking workers were regularly called "faggot" and "dyke." *See* Erickson Aff. ¶ 9; Thibault Aff. ¶ 6; Affidavit of Charles Staats ("Staats Aff.") ¶ 7; Chamorro Aff. ¶¶ 4, 6; Spinale Aff. ¶ 4; MacInnis Aff. ¶¶ 16-17; Swagger Aff. ¶ 12. The vulgar and discriminatory verbal attacks lodged towards Erickson, daily, warrant special attention. Erickson Aff. ¶ 5. Erickson was targeted by Union Steward David Smith, daily, with comments like "dumb bitch dyke." *Id.* ¶ 11. Smith's

conduct continues day-to-day, unabated. On July 4, Union Trustee Catano yelled at Erickson "you fucking faggot" and "you fucking pussy." *Id.* ¶ 10.

f. Defendants Have Engaged in Negligent and Reckless Driving.

On multiple occasions on the highways in and around Boston, Local 25 union members or other picketers have engaged in reckless operation of motor vehicles that have endangered the lives of Republic's non-striking drivers and the general public, by cutting off Republic trucks, trying to force a truck into a low clearance tunnel, slamming on their brakes and coming to a complete stop in the middle of the highway in front of Republic trucks, or swerving towards Republic trucks to try to cause a collision. MacInnis Aff. ¶ 5; Affidavit of Anthony Lembo ("Lembo Aff.") ¶¶ 3-5; Affidavit of Louis Garner ("Garner Aff.") ¶¶ 3-7. Braking or swerving in front of a passenger vehicle is not the same as doing so in front of a large, heavy, waste disposal truck. Heavy trucks need more room to brake than do passenger vehicles. Due to the size, weight and limited maneuverability of Republic's trucks, particularly as compared to typical passenger vehicles, causing such a truck to collide with the Defendants, or the general public, runs a serious risk of injury or death.

**B. Defendants Personally Engaged in, and/or Ratified the Conduct.**

Local 25, by and through its officers, representatives and agents, has ratified the foregoing unlawful conduct by sponsoring the picketing, condoning the picketing activities, and personally participating in the conduct. Logan participated in the violent acts and detention of vans full of Republic employees on July 1, 2025. Reece Aff. ¶ 5. Catano also leaned into Mitchell's car window, screaming profanity and sending spittle onto Mitchell. Mitchell Aff. ¶ 5. On July 2, Catano threatened Ganno "Get out of the car, I'm going to fuck you up" and then "I'm going to beat you up, you are a piece of shit." Ganno Aff. ¶ 4. Likewise, Smith has yelled homophobic slurs and threats at Erickson, daily. Erickson Aff. ¶ 11. Picketers wore Local 25 union signs and/or insignia and yelled comments like "don't touch my truck," indicating their purpose was aligned with the Union. Noble Aff. ¶ 4; Erickson Aff. ¶ 12.

In addition, Republic has reason to believe that the conduct will not worsen. On July 4, 2025, a Local 25 member told a Republic manager that "shits gonna get ugly" and that the strike

was "going national, then it usually gets uglier at that point. There's people coming in and going out from locals all over the country and in Boston." Affidavit of Ed Veilleux ("Veilleux Aff.") ¶ 3. As previously noted, Mari yelled at Runge "[i]t's only going to get worse Kenny . . . we are going to ramp it up – you haven't seen anything yet." Runge Aff. ¶ 5. Plaintiffs have no reason to think that Mari will not make good on his threat of continued and escalating unlawful behavior.[4]

### C.    Law Enforcement has been Unable to Control Local 25s Conduct.

Republic  contracted with several police departments to provide police "detail" officers in an attempt to provide security at several locations, at a cost of approximately $100,000, daily. Lavery Aff. ¶ 25. All of these unlawful acts transpired despite the local detail officers being on site. Runge Aff. ¶ 3. Republic has called for on-duty police assistance regularly throughout the strike. MacInnis Aff. ¶ 5; Martinez Aff. ¶ 6; Chamorro Aff. ¶ 7. The police presence was insufficient to stop the picketers from using a knife to flatten tires or to clear the way to allow the vans through. Reece Aff. ¶ 6.

Multiple drivers who have been blocked in and trapped in their trucks in Quincy have called police and have not received assistance timely, or at all. Hanley Aff. ¶ 6; MacInnis Aff. ¶¶ 7-10; 15-19. At times officers have joked and shook hands with the Local 25 vandals, at other times they have simply indicated they would not intervene, or that Republic should "file a report" later about obvious vandalism and unlawful conduct. MacInnis Aff. ¶ 8; Swagger Aff. ¶ 17.

Area Security Manager Jeff Swagger has been in constant contact with several police departments. On July 7, 2025 at the Roxbury Facility, Republic hired seven Boston police officers for a security detail. Swagger Aff. ¶ 9. A Captain present told Swagger his trucks would be blocked by the union that day, and in fact were blocked by the Local 25 picketers. *Id.* The picketers ignored the police commands to free the trucks and move. *Id.* ¶ 10.

On other occasions police officers have made statements to Republic employees such as "there are more of them than there are of us; if we don't do what the picketers want, they will bring 300 more people down here, we cannot arrest them all, there is no way we can start making arrests because there are too few of us and too many of them." Swagger Aff. ¶ 22.

---

[4] On July 10, 2025, Republic notified Local 25, via letter, that it must cease and desist all illegal picket activities.

**D.    Republic's Business has been Damaged by the Unlawful Strike Conduct.**

Because of the strike Republic has lost access to its property, lost use and enjoyment of its property, and has been severely curtailed in meeting its obligations to provide waste removal services to the residents of Massachusetts. Lavery Aff. ¶ 31. This is not only a business concern, but also a public health, welfare and safety concern as trash removal is an essential element to allowing the general public the proper use and enjoyment of their properties. Swagger Aff. ¶ 24.

Republic is engaged in a highly competitive business depending on the free ingress and egress of its contractors, subcontractors, suppliers, customers, visitors, invitees, officers, employees, and the employees of its contractors and subcontractors. Lavery Aff. ¶ 24. Defendants actions have impeded free ingress and egress, impeded the ability for Republic to provide its waste collection, removal and disposal business and have damaged and will continue to damage Republic's property, its goodwill with its customers, vendors, and its business interests. *Id*. Since the strike began on July 1, 2025, BU 141 and BU 143 have experienced severe declines in their abilities to service customer routes, which has had and continues to have a catastrophic effect on Republic's business. *Id*. ¶ 31.

In addition, Local 25 has reached out to Republic customers and vendors to attempt to damage their business relationships. Lavery Aff. ¶¶ 26-28.

## III.    DISCUSSION

**A.    Standard for an Injunction.**

A party seeking a preliminary injunction must show (1) likelihood of success on the merits; (2) irreparable harm will result from denial of the injunction; and (3) in light of the moving party's likelihood of success on the merits, the risk of irreparable harm to the moving party outweighs the potential harm to the nonmoving party in granting the injunction. *Bos. Firefighters Union, Local 718, Int'l Ass'n of Fire Fighters, AFL-CIO v. Boston*, 205 N.E.3d 282, 289 (Mass. 2023).

**B.    Republic is Likely to Succeed on its Claims.**

Republic is likely to succeed on its nuisance claim. To succeed on its private nuisance claim, Republic must show that Defendants "caused a substantial and unreasonable interference with the use and enjoyment" of Republic's property. *Rattigan v. Wile*, 445 Mass. 850, 856 (2006) (internal citation omitted). Under Massachusetts law, a person's right to use and enjoy their land is

interpreted broadly, and a defendant "need not 'directly damage the land or prevent its use in order to constitute a nuisance.'" *See id.* at 858. Notably, the question of whether the interference is continuing or recurring is an important factor. *Id.*

Here, Defendants have interfered with Republic's use and enjoyment of its property on a daily basis at eight different locations throughout Massachusetts by (1) screaming threats of physical harm and shouting racially offensive, homophobic and sexist language at Republic employees who were otherwise legally occupying Republic's property; (2) physically obstructing the entrances and exits of Republic's property; and (3) erecting makeshift barricades to block the entrance to Republic's property. Defendants' interference is so substantial and unreasonable that: (1) Republic closed its Revere Facility from July 1, 2025, to July 10, 2025; (2) Republic closed its Holbrook and Quincy facilities for nearly a week; and (3) Republic closed its Roxbury facility for five days before briefly reopening the facility, which promptly closed again due to Defendants' interference. Moreover, even at those facilities that are currently open, Republic still does not have full use of its property because Defendants' physical obstruction and violent conduct means only a fraction of Republic's fleet can exit the facility on any given day. As such, Republic is reasonably likely to succeed on the merits of its private nuisance claim. *See Rattigan*, 445 Mass. 856.

Republic is also likely to succeed on its trespass to chattel claim. *New England Tel & Tel. v. Nat'l Merch. Corp.*, 335 Mass. 658, 664 (1957); *Spooner v. Manchester*, 133 Mass. 270, 272 (1882); *see also Smith v. Wright*, 2013 WL 1042544, at *6 (Mass. App. Div. March 6, 2013) (citing Restatement, Second, Torts § 218 (1965)). One who commits a trespass to chattel is subject to liability to the possessor of the chattel if bodily harm is caused to the possessor, or harm is caused to a person or thing in which the possessor has a legally protected interest. *New England Tel & Tel.*, 335 Mass. at 664; Spooner, 133 Mass. at 272; see also Smith, 2013 WL 1042544, at *6. Here, Defendants stole a Republic truck from a transfer station in Boston, slashed the tires of vehicles, disconnected battery lines, disabled air brake lines, pulled out air hoses, destroyed and/or tampered with fuel caps, and put a cigar in a fuel tank, all of which damaged or impaired the quality and condition of Republic's property and deprived Republic of its use of its property for a substantial time. Additionally, Republic has a legally protected interest—in fact, an obligation—to provide its

13

employees with a safe workplace. Defendants caused bodily harm to Republic's employees by, on at least one occasion, spraying an employee in the face with window cleaner. Numerous individuals witnessed Defendants' actions that constitute trespass against chattel, as established by affidavits filed herewith. As such, Republic is reasonably likely to succeed on this claim.

Further, Republic is likely to succeed on its claim for violation of the Massachusetts Civil Rights Act ("MCRA"), G.L. c. 12, § 11I. To establish a claim under the MCRA, Republic "must prove that (1) [its] exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth, (2) has been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by 'threats, intimidation or coercion.'" *Bally v. Ne. Univ.*, 403 Mass. 713, 717 (1989). The MCRA was enacted to provide "enhanced protection of civil rights" under state law and is entitled to liberal construction of its terms. *Haufler v. Zotos*, 446 Mass. 489, 504 (2006).

Here, Defendants' threatening and intimidating conduct has interfered with Republic's constitutional right as a landowner to use its property. *See Haufler*, 446 Mass. at 504. In *Haufler*, 446 Mass. 489, 502, the plaintiff alleged that his neighbor violated the MCRA by yelling at the plaintiff, blocking the entrance to the plaintiff's property with a sawhorse, and harassing individuals that plaintiff hired to work on his property. The judge found the defendant's conduct interfered with the plaintiff's constitutional right to use his land. *Id.* Here, Defendants have engaged in even more egregious acts of harassment and obstruction toward Republic and employees on Republic's property. *See id.* Separately, Defendants' threatening and intimidating conduct has interfered with the rights of Republic's employees to work in a workplace free of harassment and discrimination, under equal protection of law. *See O'Connell v. Chasdi*, 400 Mass. 686, 693 (1987). Additionally, this conduct plainly rises to the level of threats, intimidation and coercion within the meaning of the MCRA. *See Planned Parenthood League of Mass. v. Blake*, 417 Mass. 467, 473-75 (1994). Because Defendants' threatening and intimidating conduct has interfered with Republic's constitutional right to use its land and has separately interfered with the constitutional rights of Republic's employees to work without being subject to unlawful harassment and discrimination, Republic is reasonably likely to succeed on its claim for a violation of the MCRA.

### C.    The Norris-LaGuardia Act Supports a Finding that Republic is Likely to Succeed on its Underlying Claims.

The Norris-LaGuardia Act, 29 U.S.C. § 101 *et seq.* (the "NL Act"), permits federal district courts to enjoin unlawful acts of the sort involved in this case that "involve or grow out of a labor dispute."[5] *See Westinghouse Broad. Co. v. Dukakis*, 412 F. Supp. 580, 584 (D. Mass. 1976). The United States Supreme Court has said lower courts may forbid "mass picketing, threatening employees desiring to work with physical injury or property damage, obstructing entrance to and egress from the company's factory, obstructing the streets and public roads surrounding the factory, and picketing the homes of employees." *Allen-Bradley v. Wis. Emp't Rels. Bd.*, 315 U.S. 740, 748 (1942). According to the Supreme Court, the NL Act "was not intended to interfere with the power to restrain violent acts. And it was contemplated expressly the court might intervene to prevent [violence]." *Bhd. of R.R. Trainmen v. Toledo P. & W.R. Co.*, 321 U.S. 50, 65 (1944).

The NL Act permits this Court to issue an injunction against strikers if: (1) unlawful acts have been threatened and will be committed unless restrained; (2) substantial and irreparable injury to Republic's property will follow; (3) as to each item of relief granted, more injury will be inflicted upon Republic by denial of relief than will be inflicted upon the strikers by the granting of relief; (4) Republic has no adequate remedy at law; and (5) the public officers charged with the duty to protect the employer's property are unable or unwilling to furnish adequate protection.[6]  29 U.S.C. § 107; *see Westinghouse*, 412 F. Supp. at 583.

---

[5] Likewise, a court may enjoin unlawful picket conduct pursuant to the Massachusetts Anti-Injunction Act, M.G.L. c. 214 §6 ("MA Act").  The state law is "modelled after the Norris-LaGuardia Act" and the purposes are parallel.  *E. Middlesex Press*, 1995 Mass. Super. LEXIS 502, at *12-13.  Plaintiffs submit that the misconduct at issue here is enjoinable under both laws, without waiving their position that the analyses under each differs somewhat.

[6] M.G.L. c. 214 § 6 (1) similarly provides a court may issue an injunction upon a finding that:

> (a) That unlawful acts have been threatened and will be committed unless restrained or have been committed and will be continued unless restrained, but no injunction or temporary restraining order shall be issued on account of any threat or unlawful act excepting against the person or persons, association or organization making the threat or committing the unlawful act or actually authorizing or ratifying the same after actual knowledge thereof; (b) That substantial and irreparable injury to the plaintiff's property will follow; (c) That as to each item of relief granted greater injury will be inflicted upon the plaintiff by the denial of relief than will be inflicted upon the defendants by the granting of relief; (d) That the plaintiff has no adequate remedy at law; and (e) That the public officers charged with the duty to protect the plaintiff's property are unable or unwilling to furnish adequate protection.

The U.S. Supreme Court has expressly endorsed the power of states to issue injunctions like those permitted under this provision.  Applying this principle, the Court stated:

Picketing must be peaceful, nothing more and nothing less. If it is intended to persuade non-strikers and others—by peaceful communication—to change their behavior toward a struck employer, the picketing is lawful. It cannot, however, be used to threaten, interfere, intimidate, delay, block access to or surround trash containers, or otherwise impede an employer's operation of its business.[7] In terms of the NL Act's prohibitions, the relevant question in the context of this case is whether the Defendant's conduct, as set forth in this record, amounts to peaceful picketing, or whether it amounts to coercion and intimidation. Conduct that cannot be enjoined pursuant to the NL Act, includes behavior "[b]y all lawful means" that aids in a labor dispute, publicizing the dispute—without fraud or "violence,"—and "[a]ssembling peaceably." 29 U.S.C. § 104. Conversely, picketers engaged in unlawful, violent, and/or non-peaceable acts during a strike are ripe to be enjoined. Furthermore, the NL Act does not require a showing that the injury to plaintiff's property will be unavoidable in order to justify an injunction; rather, only the likelihood of such injury need be shown. *United Parcel Serv. v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers (Local 25)*, 421 F. Supp. 452, 458-59 (D. Mass. 1976). In this case, Republic easily satisfies all of the above five prerequisites to enjoin Local 25's coercive conduct.

**D.    Unlawful Acts Have Occurred, Have Been Threatened and Will Be Committed Unless Restrained.**

This Court is permitted to enjoin conduct that involves, among other things, the act or threat of a breach of the peace, fraud or violence, trespassing upon an employer's property, or blocking access to or egress from an employer's premises. To qualify as "unlawful," an act need not violate a criminal or civil statute. Rather, "mischief" that disrupts an employer's business is sufficiently unlawful. *Westinghouse*, 412 F. Supp. at 583; *Potomac Elec. Power Co. v. Washington Chapter of the Cong. of Racial Equal. ("Pepco")*, 210 F. Supp. 418, 421 (D.D.C. 1962). Indeed, the

---

[W]e have allowed the State to grant compensation for the consequences, as defined by the traditional law of tort, of conduct marked by violence and eminent threats to the public order. [Citing cases]. We have also allowed the States to enjoin such conduct. [Citations omitted]. State jurisdiction has prevailed in these situations because the compelling interest, in the scheme of our federalism, in the maintenance of domestic peace is not overwritten in the absence of clearly expressed congressional direction.

*Garmon*, 359 U.S. at 248; s*ee Linn v. United Plant Guard Workers of America*, 383 U.S. 53, 62 (1966).

[7] Under Massachusetts law, a showing that the complained-of conduct is "unlawful" suffices. *See Verizon New Eng. v. Sys. Council T-6*, 2011 Mass. Super. LEXIS 222 at **25-26 (Aug. 19, 2011).

jurisdiction of this Court over picketing activities includes "the preservation of the peace." *Westinghouse*, 412 F. Supp. at 584.

a.    Defendants' Violence, Threats and Vandalism Must be Enjoined

Violence and/or threats of violence are unlawful tactics under both state and federal law.[8] *See, e.g., Youngdahl v. Rainfair,* 355 U.S. 131, 139 (1957); *Suffolk Constr. v. Local 67, United Bhd. of Carpenters & Joiners*, 736 F. Supp. 1179, 1183 (D. Mass. 1990); *Reed Nat'l Corp. v. Local No. 430, Int'l Union, UAW*, 1981 U.S. Dist. LEXIS 13286, at *10 (D. Mass. July 16, 1981); *United Parcel Serv.*, 421 F. Supp.at 458-59; *E. Middlesex Press Publs*, 1995 Mass. Super. LEXIS 502, at *12-13. Verbal threats of harm and violence are sufficient to warrant an injunction. *See, e.g., Suffolk Constr.*, 736 F. Supp. at 1183; *Reed Nat'l Corp.*, 1981 U.S. Dist. LEXIS 13286, at *10; *E. Middlesex Press*, 1995 Mass. Super. LEXIS 502, at *12-13. Indeed,

> Fear may be inspired without physical violence or spoken threats, moral intimidation may be accomplished by a menacing attitude and a display of force which may coerce the will as effectually as actual physical violence. The gathering of strikers in considerable numbers at the entrance of a factory with threatening attitude toward employees, who must run the gauntlet of a hostile picket line in going to and from work, may overawe and make them afraid.

*Hartford Div., Emhart Indus. v. Amalgamated Local Union 376,* 461 A.2d 422, 435 (Conn. 1983).

Acts of vandalism are also properly enjoined under federal law.[9] *See Charles D. Bonanno Linen Serv. v. McCarthy*, 532 F.2d 189, 190 (1st Cir. 1976)*; Reed*, 1981 U.S. Dist. LEXIS 13286, at *10. Vandalism such as "window breaking, tire slashing," warrants an injunction, as does "threatening" conduct. *Bonanno*, 532 F.2d at 190. Violent acts such as obstructing passage of vehicles, throwing objects, damaging vehicles causing flat tires, and spitting on vehicles warrant injunctive relief. *Suffolk*, 736 F. Supp. at 1182-83. In addition, so-called "provocative acts" such as standing in front of vehicles, shouting derogatory epithets and threating drivers of vehicles with physical injury constitute the type of violent picket line acts that are properly enjoined. *Id.*

As detailed more fully above and in Plaintiffs' Verified Complaint, Defendants have engaged in violent, coercive, conduct, and extreme acts of vandalism in an attempt to stop

---

[8] State law also prohibits assault and threats. *See* M.G.L. c. 265 § 13A (assault); M.G.L. c. 275 § 2 (threats).
[9] M.G.L. c. 266 § 126A prohibits vandalism.

Republic's business operations. Local 25 picketers have also engaged in numerous threats. Such unlawful picket activity is ripe for the injunction Republic seeks.

      b.    <u>Defendants Must be Enjoined from Blocking Ingress to and Egress from Republic's Facilities</u>

Blocking ingress and egress to an employer's premises amounts to unlawful conduct that must be enjoined.[10] Courts routinely find that large masses of pickets, like those at issue here, intimidate the public from patronizing a business and intimidate employees from going to work. *Youngdahl*, 355 U.S. at 139; *Bonanno*, 532 F.2d at 190; *District 30, United Mine Workers of Am. v. NLRB*, 819 F.2d 651, 655 (6th Cir. 1987); *Dist. 1199E, Nat'l Union of Hosp. & Health Care Emps. v. Johns Hopkins Hosp.*, 444 A.2d 448, 451 (Md. 1982); *see also United Parcel Serv.*, 421 F. Supp. at 458-59; *Teamsters, Local 379 (Catalano Bros.)*, 175 NLRB 459, 469-70 (1969). In addition, mass picketing should be enjoined because it is often considered to be a trespass and/or constructive seizure of the employer's property. *See, e.g., Schnabel Assocs. v. Bldg. & Constr. Trades Council*, 487 A.2d 1327, 1336 (Pa. 1985). Mass picketing represents a physical obstruction to access and, therefore, intrudes to a greater degree on property rights of the employer than does ordinary picketing. *Kaplan's Fruit & Produce v. Superior Court of Los Angeles Cnty.*, 603 P.2d 1341, 1354 (Cal. 1979). Numerous courts have held that "[i]nterference with a free right of ingress and egress to and from a plant by those who had such a right is unlawful." *Hartford Div.*, 461 A.2d at 434 (*citing Am. Steel Foundries v. Tri-City Central Trades Council*, 257 U.S. 184, 204 (1921)).

The record is replete with evidence that the picketers conducted their picket line in such a way as to block ingress to and egress from the Revere Facility, the Peabody Hauling Facility, the Roxbury Facility, and the Holbrook Facility. Local 25 blocked the initial vehicle convoy entering the Revere Facility on July 1 for up to three hours. Martinez was blocked from leaving the Peabody Hauling Facility later that afternoon. Swagger's convoy was blocked again from entering the Roxbury Facility on July 7. A truck attempting to leave the Roxbury Facility that morning was

---

[10] Trespass is both a civil and a potentially criminal violation under Massachusetts state law. *See* M.G.L. c. 266, §120. In addition, under Massachusetts law, a nuisance arises when the offending party's conduct causes a substantial and unreasonable interference with the property owner's use and enjoyment of that property or when the owner is deprived of the exclusive right to enjoy the property. *See Connerty v. Metro. Dist. Comm'n*, 398 Mass. 140, 147 (1986); *Trites v. Cricones*, 105 Mass. App. Ct. 246, 249 (2025).

physically surrounded, disabled, and therefore unable to exit to his route. On July 8, 2025, a foreign lock was placed on one of the exit gates at the Revere Facility.

> c.  The Court Must Stop Defendants from Reckless Driving and Endangering the Public.

Reckless driving that impedes or interferes with employees' safely operating vehicles is not protected.[11] *See Oneita Knitting Mills v. NLRB*, 375 F.2d 385, 392 (4th Cir. 1967). Reckless driving of this nature is properly enjoined. *See Squillacote v. Local 248, Meat & Allied Food Workers*, 390 F. Supp. 1180, 1186-87 (E.D. Wis. 1975).

Defendants and those acting in concert with them have followed Republic trucks, swerved in front of trucks while they were driving, and engaged in so-called "brake jobs," slamming on their brakes and/or coming to a complete stop, in the middle of public highways. In one instance, picketers tried to force a Republic driver into a tunnel with an insufficient head clearance, ostensibly to cause an almost certain vehicle accident. Recklessly driving to endanger a Republic employee—not to mention the general public—is the kind of conduct that must be enjoined.

> d.  The Court Must Enjoin Defendants' Discriminatory Harassing Conduct.

Vulgar and harassing conduct on the picket line is properly considered in the injunction analysis. *Verizon New Eng. v. Sys. Council T-6,* 2011 Mass. Super. LEXIS 222 at **13-14 (Aug. 19, 2011). Indeed, racist and threatening verbal conduct in the context of a strike may properly be enjoined. *See Youngdahl*, 355 U.S. at 138-39; *Standifer v. Gen. Teamsters, Chauffeurs & Helpers Union No. 460*, 1998 U.S. Dist. LEXIS 6430, at *5 (D. Kan. Apr. 13, 1998). If name-calling is calculated to provoke violence, and is likely to do so, an injunction is proper. *Youngdahl,* 355 U.S. at 138-39. Perhaps the most shocking example of Local 25s harassing conduct were picketers' racist remarks to non-striking workers referring to a driver as "fucking n****r," remarking "Whites only," and calling Cao a "fucking chink." Although many of Republic's employees were called "faggot" and other slurs, Erickson was targeted by Union Steward David Smith, daily, with comments like "dumb bitch dyke." Other comments hurled at Erickson included "[d]o you pee standing up or

---

[11] Reckless or negligent operation of a motor vehicle violates Massachusetts state law.  *See* M.G.L. c. 90 § 24(2)(a).

sitting down," and "[y]ou fucking faggot." On July 4, Catano yelled at Erickson "you fucking faggot" and "you fucking pussy."

  **E.** **Substantial and Irreparable Injury has Arisen, and will Continue.**

  Irreparable harm that rises to a level such that no adequate remedy at law exists, must be enjoined. *Bos. Firefighters*, 205 N.E.3d at 294. Violence and intimidation towards customers, employees and the public are sufficient to find irreparable injury to an employer. *Reed*, 1981 U.S. Dist. LEXIS 13286, at *8-9. Blocking ingress and egress to an employer's facility also results in irreparable harm. *United Parcel Service*, 421 F. Supp. at 458-59. Reputational harm can be irreparable under certain circumstances. *Holick v. Bos. Med. Ctr.*, 2021 Mass. Super. LEXIS 491, at *43-44 (Aug. 31, 2021). It is well established that the Court should grant an injunction when "[w]ithout question substantial and irreparable injury to the complainant's property, namely, his right to do business free from illegal interference" is impeded. *Verizon*, 2011 Mass. Super. LEXIS 222 at *29 (*citing Simon v. Schwachman*, 301 Mass. 573, 582 (1938)).

  Republic's loss of the right to operate in its business interest and the forced partial shutdown of its facilities amount to irreparable injury. *See Hilde Const. v. Int'l Union of Operating Eng'rs, Local No. 400*, 499 F. Supp. 971, 975 (D. Mont. 1980). Similarly to the inability to conduct business, "[e]vidence of loss of control over business reputation and damage to goodwill could constitute irreparable harm." *Herb Reed Enters.C v. Fla. Entm't Mgmt.,* 736 F.3d 1239, 1250 (9th Cir. 2013) (*citing Stuhlbarg Int'l Sales v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001).

  Here, Defendants' activities have caused Republic to lose the operational support, and goodwill of Graham Waste Services, Win Waste, and Resource Waste Services, Reenergy Roxbury LLC. Republic's business operations have largely come to a screeching halt. Where it normally operated 100s of trucks out of 5 hubs prior to the strike, it has been relegated to letting one truck out of one facility every 7-13 minutes, and when those trucks got on the road, they were unable to complete their full roster of stops due to continued unlawful harassment. Some customers' waste has not been picked up in more than a week and Republic has the real risk of losing valuable customers as a result of garbage going uncollected.

### F.    Defendants Can Continue to Picket, Peaceably.

Denial of injunctive relief here will impose a greater burden on Republic than granting the relief will cause for Defendants, because Defendants can continue to lawfully picket. As noted above, the potential harm to Republic's property rights, business interests, and ability to serve the public in an essential service is significant. Under the guise of a union strike, Local 25 and the other Defendants are affirmatively interfering with Republic's ability to perform its function of trash removal within the effected communities. Defendants' disruption is far reaching and impacts its approximately 400,000 customers in Massachusetts, and hundreds of Republic's employees. Republic is being forced to delay, dodge, and work around the picketers in order to simply do its job and access its private property.

On the other hand, Local 25 can accomplish its demonstrative goals without trampling over Republic's rights. Defendants are able to picket without violating federal and state law, blocking access to Republic's facilities, and without interfering with the work Republic's drivers and employees are attempting to carry out. Thus, the hardship faced by Defendants is minimal.

### G.    Republic has no Adequate Remedy at Law.

Plaintiffs have no adequate remedy to protect themselves from Defendants' unlawful conduct. As noted above, an award of monetary damages would not and could not fully compensate Plaintiff for the damage caused by Defendants' conduct. *Reed*, 1981 U.S. Dist. LEXIS 13286, *9-10. In addition, there is no monetary remedy that can compensate Republic's employees from Local 25's vicious, violent and harassing attacks. *See Brookline v. Goldstein*, 447 N.E.2d 641, 645 (Mass. 1983). Defendants' unlawful actions show no regard for the damage caused. Instead, Defendants' continuing, unlawful acts demonstrate that they believe themselves to be above the law and are willing to use any and all means necessary to publicize their labor dispute with Republic, regardless of the harm that they cause to Republic and the members of the public, at large. As such, Republic has no adequate remedy at law to protect itself or its customers.

### H.    Police are Unable or Unwilling to Furnish Adequate Protection.

Authority to maintain order and enforce the law at the Republic's location lies with the local and state police departments. Since picketing began on July 1, 2025, Republic has contracted with

several police departments to provide police "detail" officers in an attempt to provide security. Many of the events detailed in the supporting affidavits transpired despite these local detail officers being on site. Republic has also called for on-duty police assistance regularly throughout the strike. As noted above, the police presence was insufficient to stop the picketers from using a knife to flatten tires or clear the way to allow the vans through.

Multiple drivers who were blocked, assaulted and harassed on their routes have called local police. At times officers have joked and shaken hands with the Local 25 vandals, at other times they have simply indicated they would not intervene, or that Republic should "file a report" later about obvious vandalism and unlawful conduct. On other occasions police officers have made statements to Republic employees such as "there are more of them than there are of us; if we don't do what the picketers want they will bring 300 more people down here, we cannot arrest them all, there is no way we can start making arrests because there are too few of us and too many of them." Police presence has not been enough to quell the picketers' violence.

I.      **The Threat to Public Health Favors Granting the Injunction.**

Here, the public would not be injured if the Court grants Republic an injunction. Instead, the public will undoubtedly benefit if the Court issues the requested injunction. As outlined above, Republic is contracted by multiple municipalities in Massachusetts to pick up both household and commercial waste. Republic serves approximately 400,000 customers in the state. There is a real threat to public health if Republic is prevented from carrying out this job. As the United States District Court for the District of Nevada recognized when granting an injunction against another Teamsters union in Reno: "the presence of raw garbage and other hazardous waste presents a substantial risk to public health, especially when it goes uncollected for a lengthy period of time." *Waste Mgmt. of Ne. v. Int'l Bhd. of Teamsters Local Union 533*, 3:18-CV-00539-LRH-WGC (D. Nev. Nov. 14, 2018) (unpublished opinion), copy available upon request. This danger to the public is real and supports the issuance of an injunction against Defendants. The public interest therefore undoubtedly supports the injunction Republic seeks here.

### J.    Any Bond Should be Nominal Due to the Minimal Risk, If Any, to the Teamsters.

A nominal bond will fulfill the intent of the security requirement for injunctive relief. Fed. R. Civ. P. 65(c) requires the posting of a bond in the sum that the court deems proper for an injunction to be effective. The bond here should be nominal as there is little, if any, risk to Local 25 from the issuance of the injunctive relief and it will not cause hardship to Defendants.

## IV.    CONCLUSION

For all of the foregoing reasons, Republic respectfully requests that this Court grant the injunctive relief prayed for in the Verified Complaint.

Respectfully submitted,

**ALLIED WASTE NORTH AMERICA, LLC AND 623 LANDFILL, INC.,**

By their Attorneys,

*/s/ Jillian S. Folger-Hartwell*
Jillian S. Folger-Hartwell (BBO#658240)
LITTLER MENDELSON P.C.
One Financial Plaza, Suite 2205
Providence, RI 02903
Telephone: 401.824.2500
Facsimile: 401.454.2969
jfolgerhartwell@littler.com

Ellen E. Lemire (BBO#670994)
LITTLER MENDELSON P.C.
One International Place, Suite 2700
Boston, MA 02110
Telephone: 617.378.6000
Facsimile: 617.737.0052
elemire@littler.com

Dated:  July 14, 2025

## CERTIFICATE OF SERVICE

I, Jillian S. Folger-Hartwell, hereby certify that, on this 14th day of July, 2025, a true copy of the foregoing document was served on the below via email as follows:

Michael Feinberg, Esq.                    Mr. Thomas Mari, President
Feinberg, Dumont & Brennan                Teamsters Local 25
177 Milk Street – Suite 300               544 Main Street
Boston, Massachusetts 02109               Boston, Massachusetts 02129
maf@fdb-law.com                           tmari@teamsterslocal25.com


*/s/ Jillian S. Folger-Hartwell*
Jillian S. Folger-Hartwell