UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALLIED WASTE NORTH AMERICA,<br>LLC AND 623 LANDFILL, INC.,<br><br>       PLAINTIFFS,<br><br>v.<br><br>INTERNATIONAL BROTHERHOOD OF<br>TEAMSTERS, LOCAL 25, THOMAS G. MARI,<br>INDIVIDUALLY AND AS PRESIDENT,<br>STEVEN J.SOUTH, AS<br>SECRETARY-TREASURER, JOAN C. COREY,<br>AS VICE PRESIDENT/BUSINESS<br>AGENT, PETER S. BERRY, AS RECORDING<br>SECRETARY, MILTON DEPINA,<br>INDIVIDUALLY AND AS UNION<br>REPRESENTATIVE, NICO CATANO,<br>INDIVIDUALLY AND AS UNION TRUSTEE,<br>ERIC LOGAN, INDIVIDUALLY AND AS<br>UNION REPRESENTATIVE, DAVID SMITH,<br>INDIVIDUALLY AND AS UNION<br>REPRESENTATIVE BRIAN J. HATCH,<br>INDIVIDUALLY AND AS BUSINESS AGENT,<br><br>And<br><br>JOHN DOES 1-100; and all other conspiring,<br>acting in concert, or otherwise participating with<br>them or acting in their aid or behalf,<br><br>       DEFENDANTS. | CIVIL ACTION NO. 1-25-cv-11990 |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY
RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION**

## I.     INTRODUCTION

The International Brotherhood of Teamsters Local 25, Thomas G. Mari, Steven J. South, Joan C. Corey, Peter S. Berry, Milton Depina, Nico Catano, Eric Logan, David Smith, Brian Hatch, and John Does 1-100 (collectively, "Defendants") file this Opposition to Plaintiffs Allied Waste North America, LLC and 623 Landfill, Inc.'s (collectively, "Republic Services," "Republic," or "Company") Motion for Temporary Restraining Order and Motion for Preliminary Injunction ("Motion").

In its Motion, Republic seeks a preliminary injunction and temporary restraining order pursuant to the Norris-LaGuardia Act, 29 U.S.C. § 101 et seq. ("NLA" or "the Act"). Motion at 15. The NLA precludes federal courts from entering injunctions in suits involving a labor dispute, unless and until Republic meets *all* its strict requirements. These requirements include having a full testimonial hearing and providing sufficient evidence from which this court can make findings of fact related to five (5) crucial elements. Republic has not and cannot produce any such evidence.

Therefore, by requesting a temporary and permanent injunction in the middle of a labor dispute without any credible evidence of unlawfulness attributable to the Union or credible evidence that would support the Act's other jurisdictional prerequisites, Republic asks this Court for an extraordinary remedy that it cannot provide. Granting Republic's request would alter the balance of bargaining rights between the parties as established and guaranteed by the National Labor Relations Act. Accordingly, as elaborated below, Republic's requests should be denied.

## II.     LEGAL BACKGROUND

The NLA deprives federal courts of jurisdiction to issue injunctions arising from labor disputes. 29 U.S.C. § 101 et seq. In the late 1800s and early 1900s, the federal judiciary was seen as a major obstacle to allowing workers to withhold their labor in an effort to resolve disputes. During this time, the courts repeatedly intervened by using antitrust legislation and injunctions to

2

break strikes and tilt the scales in favor of management. This was true even after the Clayton Anti-Trust Act passed in 1914, which courts largely ignored. *See Burlington N. R.R. v. Maint. of Way Emps.*, 481 U.S. 429, 438 (1987). Thus, it was against this backdrop that Congress, in 1914, enacted the NLA, intending to only allow injunctions in the most extreme situations. *See* 29 U.S.C. § 102.

To this end, Section 101 states that "no court of the United States … shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, *except in a strict conformity with the provisions of this Act*." 29 U.S.C. § 101 (emphasis added). This language has been broadly enforced to achieve the policy goals of the Act. *See, e.g.*, *New Negro Alliance v. Sanitary Grocery Co., Inc.*, 303 U.S. 552, 559-63 (1938); *Burlington Northern Santa Fe Ry. Co. v. Int'l Bhd. of Teamsters Local 174*, 203 F.3d 703 (9th Cir. 2000).

Section 107 of the Act outlines the requirements for a narrow exception. Under its strictures, a court may only issue injunctive relief in certain situations where "unlawful acts" have been threatened or committed after holding a full testimonial hearing in open court with opportunity for cross examination for "all known persons against whom relief is sought" and "the chief of those public officials of the county and city within which the unlawful acts have been threatened or committed" have received proper notice of the hearing; and the court has issued findings of fact related to five (5) elements. 29 U.S.C. § 107. Namely, before injunctive relief is possible, Section 107 requires courts to make the following factual findings:

> (a) That unlawful acts have been threatened and will be committed unless restrained or have been committed and will be continued unless restrained, but no injunction or temporary restraining order shall be issued … excepting against the person … or organization making the threat or committing the unlawful act or actually authorizing or ratifying the same after actual knowledge thereof;
>
> (b) That substantial and irreparable injury to complainant's property will follow;

(c) That as to each item of relief granted greater injury will be inflicted upon complainant by the denial of relief than will be inflicted upon defendants by the granting of relief;

(d) That complainant has no adequate remedy at law; and

(e) That the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection and have received proper notice of the hearing.

*Id.*

Again, the mandate of the NLA is clear; injunctions may only be granted after satisfying these strict requirements. *Green v. Obergfell*, 121 F.2d 46, (D.C. Cir.), cert. denied, 314 U.S. 637, (1941) (where a lawsuit involves a labor dispute, injunctions cannot be granted except to restrain unlawful acts and then only in strict conformity with the requirements of the NLA).

Plaintiffs shoulder the burden of proof to establish each of the prerequisite jurisdictional findings. *Donnelly Garment Co. v. Dubinsky*, 154 F.2d 38 (8th Cir. 1946). Section 106 makes clear that:

> No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, <u>except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof.</u>

29 U.S.C. § 106 (emphasis added).

Some activities, such as picketing in a labor dispute, cannot ever be restrained—even when accompanied by illegal act. Instead, only the illegal acts themselves may be enjoined. *Peak v. McElroy*, 33 Pa. D. & C. 556 (Pa. C.P. 1938); *see also* 29 U.S.C. § 104 (enumerated the specific acts not subject to restraining orders or injunctions). Moreover, Section 106 requires an employer to show "clear proof" that the union authorized, participated in or ratified some unlawful action. 29 U.S.C § 106. Absent clear proof, injunctive relief will be denied against the union. *Cinderella Theater Co. v. Sign Writers' Local Union,* 6 F. Supp. 164 (D. Mich. 1934) (denying relief against

4

union officers where unknown persons threw stink bombs in owners' movie house); *Dow Chemical Co. v. International Union of Electrical, Radio & Machine Workers*, 480 F.2d 433 (5th Cir. 1973), cert. denied, 415 U.S. 932 (1974) (the active participation of three field representatives in unlawful activity does not constitute "clear proof" of union's participation).

Where plaintiffs fail to meet even one of these elements, courts have universally agreed that the NLA precludes the availability of an injunction. *See, e.g., Carter v. Herrin Motor Freight Lines, Inc.,* 131 F.2d 557 (5th Cir. 1942) (injunction improper despite acts of violence where carrier fails to prove either inability or unwillingness on part of local authorities to furnish protection); *Heintz Mfg. Co. v. United Auto Workers*, 20 F. Supp. 116, (D. Pa. 1937) (denying injunction even with evidence of numerous acts of violence when all acts of violence are at places other than at the plant itself, and no showing is made that they are being committed by any of defendants or by their authorization); *Alyeska Pipeline Service Co. v. International Brotherhood of Teamsters*, 535 F.2d 1144, (9th Cir. 1976) (denying injunctive relief where threat has become moot and acts complained of are not of nature which suggest any union intent for repetition in future); *Lauf v. E. G. Shinner & Co*., 303 U.S. 323, (1938) (court cannot issue injunction absent finding that unlawful acts had been threatened and would be committed unless restrained, or had been committed and would be continued unless restrained); *Diamond Full Fashioned Hosiery Co. v. Leader*, 20 F. Supp. 467 (D. Pa. 1937) (denying injunctive relief in absence of evidence showing that defendants induced others by intimidation, threats or persuasion to repudiate arrangements with plaintiff for removal of machinery from premises picketed by defendants); *Cimarron Coal Corp. v. United Mine Workers,* 416 F.2d 844, (6th Cir. 1969), cert. denied, 397 U.S. 919 (1970) (cannot issue injunction where record fails to indicate failing of law enforcement or property damage or physical assault for which union was responsible, even where there is evidence of blocking entry to premises). In addition,

a preliminary injunction is never granted where pleadings and affidavits disclose that plaintiffs' contentions in fact and in law are seriously disputed. *See, e.g., United States v. Weirton Steel Co.*, 7 F. Supp. 255 (D. Del. 1934).

### III.    FACTUAL BACKGROUND

#### A.  Labor Dispute

Republic Services and Teamsters Local Union No. 25 ("Union" or "Local 25") are parties to a collective bargaining agreement that began on July 1, 2020, and expired on June 30, 2025. Local 25 and Republic began negotiating a successor to that agreement on April 29, 2025. Thereafter, the parties met eight (8) more times before July 1, 2025. However, unable to reach a fair and equitable agreement, the members of Local 25 went on strike on July 1, 2025. During the strike, the parties continued to negotiate. On July 2 and July 11, 2025, the parties met with the assistance of a federal mediator to resolve the matter. The parties met again on July 15, 2025, bargaining for twelve (12) hours. During this time, the Union made significant concessions, but Republic barely budged. The parties continued negotiations again on July 18, 2025 where the Union again modified their proposals.

On July 17, 2025, Massachusetts Governor Maura Healey released a statement calling on Republic to resolve the strike, stating:

> It has now been three weeks of no trash pick-up in several Massachusetts communities, and this has gone beyond a headache for residents, businesses and municipalities—it is a public health concern and it's expensive for everyone. Sanitation workers do essential work to keep our neighborhoods clean and healthy, and they deserve fair wages, benefits and protections. Republic Services needs to come to the table and reach a fair deal — it's time to get people back to work and resume services to our communities as soon as possible.[1]

---

[1] Michael P. Norton, Beyond a Headache: Gov. Healey Calls for End to Trash Strike That's Paralyzed These Mass. Towns, MassLive (July 17, 2025), https://www.masslive.com/politics/2025/07/beyond-a-headache-gov-healey-calls-for-end-to-trash-strike-thats-paralyzed-these-mass-towns.html.

### B. The Strike

Meanwhile, at the time of this submission, Republic's employees represented by Teamsters Local 25 at facilities in Revere, Peabody, Roxbury, Quincy, and Holbrook have been on strike for eighteen (18) days, and Republic has brought in non-union replacement workers. Striking workers have established picket lines at the gates of each of the five (5) facilities, where, typically, fewer than fifteen (15) people picket at any one time. *See* Aff. David Smith, ¶ 5 ("Aff. Smith"). Not all the picketers are employees or Teamsters members. Children, politicians, union officials from other non-Teamster locals, and members of the public have joined the striking workers from time to time. *Id.* Picketers have never prevented vehicles from entering or exiting Republic facilities. At most, vehicles have been briefly delayed exiting the facilities to avoid traffic issues in accordance with police instructions. There is no record of anyone getting violent, nor has anyone been arrested or injured. The picket lines have been peaceful. *See* Aff. Smith; Aff. Eric Logan ("Aff. Logan"); Aff. Nico Catano ("Aff. Catano").

Prior to the commencement of the picketing, Local 25 officials provided strikers with instructions on how to conduct themselves. Aff. Catano, ¶ 12, Ex. 1. Those instructions, on Local 25 letterhead, direct strikers to conduct themselves professionally and peacefully and forbids them from getting into altercations, engaging in misconduct, using indecent language, and, among other things, obstructing entrances or exits. *Id.* The letter is signed by Local 25 President and Principal Officer Thomas Mari, who stresses that "the success of this strike depends on impressing management and the public with the legitimacy and righteousness of our cause." *Id.* Union officials provided the same set of verbal instructions in person. *See* Aff. Smith, ¶ 6.

Not surprisingly, the first days of the strike were contentious. Aff. Catano, ¶ 9; Aff. Smith, ¶ 13. Initially, the replacement workers taunted the picketers about stealing their jobs, honking

their horns, flipping replacement workers off, and using vulgar language, which obviously and intentionally provoked picketers. Aff. Smith, ¶ 12; Aff. Catano, ¶ 9. Nonetheless, as the strike continues, the tension between the parties has dissipated. This is a result of many factors, including less frequent provocation from replacement workers, the passage of time, and actions taken by police. Aff. Catano, ¶ 10.

For example, in an apparent attempt to maintain public safety, the five (5) different police departments responsible for overseeing picketing have enacted rules, such as brief wait times for vehicles exiting facilities, and logistical changes, such as repositioning themselves at picket lines between exiting vehicles and picketers, which have proven effective. *Id.* These interventions have decreased interactions and the potential for conflict between picketers and replacement drivers. *Id.*

### C. False Claims and Baseless Accusations

#### i. Allegedly 'Stolen' Republic Truck

Republic's Complaint is based on wild, incendiary falsehoods unsupported by even its own affidavits. To this end, without a single shred of evidence, Republic outrageously and irresponsibly implies that Local 25 stole a Republic truck. To be clear, there is absolutely no evidence that a Republic truck was ever stolen from "a Roxbury transfer station."

As an indication of the embellishments, fabrications, carelessness, and unsupported statements in the Complaint, the video Republic produced is of a facility in *Charlestown* that is owned by Cassella Waste Systems. In fact, the address of that facility is not 440 Rutherford Avenue in Roxbury, but 24 Bunker Hill Industrial Park in Charlestown. Teamsters Local Union No. 653 represents Casella Waste Systems' employees. Local 25 has never picketed that facility, nor were

any Local 25 agents or Republic employees represented by Local 25 present at that facility at the time of the "theft."

In the video, a replacement driver at around 4:30 a.m. is seen pulling up, parking, getting out of his truck and entering the scale house. Approximately two (2) minutes go by. When the Republic driver still has not come out of the building, a person in a bright reflective safety vest and clean-pressed chinos can be seen walking over to the Republic truck, getting in, and driving off, allegedly moving the truck into an adjacent parking lot, where it was neither damaged nor ransacked.

The Company claims without proof that this truck was "stolen." Apparently, from time to time at this facility, other drivers waiting to use the scale will move a truck if it is in the way and the driver is taking too long in the scale station. The truck was not stolen. It defies credulity to think that someone wanting to steal a truck in the night would walk slowly over to the truck wearing a bright reflective vest when there are people and cameras around.

Moreover, the Company acknowledges that the truck was not damaged and that nothing was taken from it. It was simply parked in an adjacent lot. The more rational explanation here is that the truck was moved by someone who was annoyed about the length of time the driver of the Republic truck was taking.

While there are many unknowns, the one certainty is that there is no reason to believe that Local 25 was in any way involved in moving the truck. There is no evidence that anyone from Local 25 was nearby at the time. The facility is used by employees from many different companies, and anyone who knows how to drive a truck would have been capable of moving the Republic vehicle to the adjacent lot.

Moreover, the baseless allegation is the point here. With the sheer number of cameras at the facility, there obviously was ample opportunity to accurately identify the driver. Instead, Republic was anxious to create the false impression that Local 25 caused the "theft" of its vehicle to influence the Court to grant its requested Temporary Restraining Order.

### ii.     Business Agent Brian Hatch

Similarly, Republic claims that Local 25 Business Agent Brian Hatch spat on a Pinkerton security guard and slashed Republic vehicle tires. However, as with the truck, this is a false, unfounded accusation.

Republic's only support for these allegations stems from two (2) affidavits, one from Revere Operations Supervisor Erick Martinez and the other from Pinkerton Security Guard Mark Nidoh. *See* Supplemental Aff. Erick Martinez ("Supp. Aff. Martinez"); Aff. Mark Nidoh ("Aff. Nidoh"). Nidoh took a picture of a man he claims spat on him in response to a comment Nidoh made about his mother. Aff. Nidoh ¶¶ 5, 7, 8. Nidoh took a picture of the man who allegedly spit on him. Aff. Nidoh ¶ 9. Nidoh provided the photo to Martinez who identified the man in the picture as Mr. Hatch. Supp. Aff. Martinez, ¶ 3. Martinez said the man in the photo was also the same man who allegedly slashed the tires of a Republic van on July 1, 2025. *Id.*

However, the picture of the man is not Brian Hatch. Aff. Brian Hatch ("Aff. Hatch"). In fact, it's not anyone who represents Local 25. The man in the picture has tattoos on his arm; Mr. Hatch does not. Aff. Hatch, ¶ 9, Ex. 1. Moreover, at the time of the July 14, 2025 incident, Mr. Hatch was about 40 minutes away. Aff. Hatch, ¶ 10, Ex. 2. Simply put, there is no basis from which anyone could conclude that Mr. Hatch was in any way, shape, or form involved in either alleged incident. Republic should either have known that he was not involved or did know and

chose to fabricate serious allegations against Mr. Hatch again, in an attempt to falsely influence the Court's decision.

### iii.  Organizer Nico Catano, Field Rep. Eric Logan, and Steward David Smith

The Company makes several other patently false assertions. The Company claims that Joint Council 10 Organizer and Local 25 Trustee Nico Catano made homophobic slurs and threatening remarks to replacement drivers. He denies ever making such statements. The recording the Company surreptitiously took of Mr. Catano clearly establishes that he was saying "maggot" and not any sort of homophobic slur. Aff. Catano, ¶¶ 7-8.

Likewise, Local 25 Field Representative Eric Logan denies calling Market Vice President Kurt Lavery any derogatory names on the picket line. When he saw him on July 1, 2025, he simply said, "There's Kurt Lavery. Hey Kurt, why don't you come tell these guys what you said about them during negotiations?" Aff. Logan, ¶ 7.

Finally, David Smith, a long-time Republic driver and shop steward, denies making any of the statements he is alleged to have made. Contrary to the unsupported allegations against him, he never made homophobic remarks to General Manager Trainee Che Erickson, and he never remarked on her weight. Aff. Erickson, ¶ 11. He did, however, tell her that as a veteran she should be ashamed of herself for taking fellow military veterans' jobs (himself included). *Id.*

### iv.  Police Inaction or Ineptitude

In seeking this injunction, the Company claims and must prove under the NLA that police have been unable or unwilling to take action to protect its interests. This, too, is untrue. Police in all five (5) jurisdictions have taken appropriate action to protect the public and ensure that vehicles are able to safely enter and exit Republic facilities. This is evidenced in the manner in which police created and enforced picket line rules, such as no bullhorns or loud noises until after 7 a.m.

and by ordering picketers to step aside and allow vehicles to exit the facility after a brief period of time. *See* Aff. Logan; Aff. Smith. Additionally, Republic's own affidavits indicate that police have intervened and assisted Republic when needed. For example, Operations Manager Joseph Ganno states that police officers from the Peabody Police Department on July 2, 2025 quickly and successfully responded to a call for assistance. *See* Aff. Joseph Ganno, ¶ 6 ("Aff. Ganno").

## IV.     ARGUMENT

The Norris-LaGuardia Act precludes the Court from issuing an injunction in the instant labor dispute. Republic has not provided the Court with sufficient evidence to support findings that the five (5) necessary jurisdictional pre-requisites have been satisfied. For these reasons, as elaborated below, an injunction would be improper.

### A. Republic Cannot Satisfy the Requirements for an Injunction.

Under the NLA, Republic must establish that the Union has or will commit unlawful acts absent an injunction; that it will suffer substantial irreparable harm, that balance of equities tips in its favor; that it has no adequate alternative remedy; and that local police in five (5) different communities are either unwilling or unable to protect its interests. Republic has failed to carry that burden.

#### i.     No Evidence that Unlawful Acts Have or Will Occur

As outlined above, courts require plaintiffs in labor disputes to draw a specific connection between the labor organization and the alleged unlawful acts before issuing an injunction. *See, e.g., Wilson & Co. v. Birl*, 105 F.2d 948 (3d Cir. 1939) (federal courts may issue injunctions only to restrain specific acts of individuals as may be expressly complained of and expressly included in findings of fact); *Rochester Tel. Corp. v. Communications Workers of America*, 456 F.2d 1057 (2d Cir. 1972) (cannot issue injunction unless there is evidence connecting the union or its

12

members to property destruction or evidence that police are unable or unwilling to furnish adequate protection); *Greyhound Lines, Inc. v. Doe*, No. 4-83-1001, 1983 U.S. Dist. LEXIS 11365 (D. Minn. Nov. 25, 1983) (refusing to issue injunction where company has failed to identify any person or organization responsible for unlawful acts or presented any evidence that law enforcement officers cannot furnish adequate protection).

Here, Republic has failed to identify Local 25 or its agents as responsible for any of the alleged unlawful actions. When the baseless and erroneous allegations are properly set aside, as they must be, Republic's request for this extraordinary remedy rests on conclusory hearsay about supposed statements from unnamed people. Considering all the inaccuracies throughout Republic's Motion and its demonstrated cavalier attitude toward making serious allegations without proof or investigation, there is no reason to trust that these unverifiable statements are credible. Because Republic has failed to lodge a sufficient allegation against Local 25's conduct, a preliminary injunction would be inappropriate.

### 1. There is no evidence that Local 25 was in any way involved in moving the Republic truck on July 10.

Specifically, Republic should not be granted an injunction based on the preposterous implication that on July 10, 2025, Local 25 "stole" or is responsible for "stealing" a Republic truck from a third-party transfer facility owned by Casella Waste Systems. While this incendiary claim, based on pure conjecture may have been successful in capturing news headlines,[2] there is

---

[2] *See, e.g.,* Frank O'Laughlin, Blame Game Intensifies with Mass. Trash Collector Strike Now in Its 3rd Week, *Yahoo News* (July 16, 2025), https://www.yahoo.com/news/blame-game-intensifies-mass-trash-131748499.html.; Ally Jarmanning, Republic Services Sues Teamsters Over Alleged Actions on Picket Line as Strike Passes Two-Week Mark, *WBUR* (July 15, 2025), https://www.wbur.org/news/2025/07/15/republic-services-teamsters-strike-lawsuit; Ross Cristantiello, Republic Services Sues Striking Teamsters as Latest Contract Talks Fail, *Boston Herald* (July 16, 2025), https://www.bostonherald.com/2025/07/16/republic-services-sues-striking-teamsters-as-latest-contract-talks-fail/.

absolutely <u>zero</u> evidence establishing (a) that the truck was ever stolen[3] or (b) that Local 25 was somehow responsible. The accusation is inflammatory and therefore reckless.

This incident allegedly occurred in the early morning hours of July 10, 2025 in full view of multiple cameras and with other witnesses on the scene. At the time of the incident, nobody from Local 25 was anywhere near the Charlestown facility. The video and related statements corroborate this. There is no allegation that there was any ambulatory picketing following the truck at 4:30 a.m. or that the driver in question saw someone he believed to be connected to Local 25 in the early morning that his truck was moved. Therefore, there is no reason to draw the connection here. Just because the strike was ongoing when the truck was moved does not mean that Local 25 was responsible. Correlation does not equal causation.

The video shows a Republic truck at approximately 4:30 a.m. pulling into the Charlestown facility. This scale station is used by numerous employees from multiple companies.[4] In the video, the driver parks in front of the scale house attendant's office, exits his vehicle, leaves it on the scale, and enters the building. A short while after another truck pulls up. More than two(2) minutes later, another person wearing clean pants and a bright orange safety vest walks calmly over to the Republic truck, gets in, and drives it off. Republic admits that the truck was then left in an adjacent parking lot, undamaged, without any items missing.

Based on this, there is no proof that the truck was ever "stolen." Rather, it was simply moved out of the way. Indeed, drivers at third-party facilities such as the Charlestown facility will

---

[3] Republic in its filings has failed to include any police report that suggests a truck was stolen. It also fails to include all the security footage from that night to show a theft.

[4] None of the employees employed by the other companies that use this facility are represented by Local 25.

frequently move a truck when the parked truck is blocking their way. Republic's affidavits do not eliminate that possibility.

Instead, Republic seeks this injunction partly on the baseless insinuation that Local 25 is somehow responsible for moving the truck because (a) only Local 25 members would have known how to drive the truck and (b) only Local 25 members would have known about the road around the back of the building. Of course, the problem with that theory is that both (a) and (b) are demonstrably false.

First, the idea that Republic trucks require a distinct set of skills to operate is categorically false. Anyone who drives a truck could have moved the Republic vehicle.

Second, there is no support for the notion that only Local 25 members would have known about the road behind the building. Any driver who uses this facility would have known about the road. Therefore, by the company's own flawed logic, there could be hundreds if not thousands of suspects, and there is simply no basis for inferring Local 25 involvement.

Instead, based on the information before the Court, the explanation is that the truck was moved by one of the drivers seen in the video. This driver moved the truck, not as a thief, but consistent with industry custom when a truck is blocking the way. Significantly, from Republic's Motion, it does not appear that Republic questioned those drivers, nor is there any statement provided by Republic that it filed a police report claiming its valuable truck was stolen. Rather, Republic included this narrative without any foundation to persuade the Court to issue an injunction.

> **2. Republic Erroneously Accuses Brian Hatch of Destruction of Property and Assault and Battery.**

Republic likewise cannot obtain an injunction based on its erroneous allegations against Local 25 Business Agent Brian Hatch. Republic accuses Mr. Hatch of using a knife on July 1,

2025, to slash and flatten Republic vehicle tires. Republic also accuses Mr. Hatch of spitting in the face of a Pinkerton security guard on July 14, 2025. These allegations are demonstrably false and should be dismissed.

As noted above, the sole basis of these allegations is a photograph taken from the security guard, which was then provided to Operations Supervisor Erick Martinez. The security guard says the photo is of the person who allegedly spat on his face at approximately 7:45 a.m. on July 14, 2025. Mr. Martinez' affidavit then identifies the person in the photograph as the same person who slashed and flattened the tires on a Republic vehicle on July 1, 2025. To connect the alleged activity to the Union, Mr. Martinez compared the photo taken by the guard to photos on Local 25's website. He mistakenly concluded that the photo was of Mr. Hatch.

However, the photo is not Mr. Hatch. The photo is of a man with tattoos on his forearm, which Mr. Hatch does not have, as can be seen by the photo attached to his affidavit. Moreover, Mr. Hatch was approximately forty (40) minutes away at the time of the alleged incident. A receipt provided by Mr. Hatch shows that he finished checking out of a Market Basket in Middleton, Massachusetts at approximately 7:39 a.m. There is simply no way he could have been in Revere, Massachusetts at the time.

### 3. Nico Catano, Eric Logan, and David Smith Did Not Make Threats, Other Statements.

Republic cannot obtain an injunction based on hearsay that various Local 25 members and officials allegedly made statements that they specifically deny. The Company notes that various replacement drivers and other representatives from Republic frequently recorded picketers. The recordings that the Republic provided, however, do not corroborate that any of the statements allegedly made by Local 25 officials were in fact made by them. To be clear, Local 25 denies ever making those statements.

Specifically, Republic alleges that Joint Council 10 Organizer and Local 25 Trustee Nico Catano threatened violence and used homophobic slurs. This never happened. It is conceded that Mr. Catano repeatedly used the word "maggot" to refer to and describe certain replacement drivers. This was in the context of replacement drivers antagonizing and taunting picketers as they were entering and exiting the facility. He never threatened anyone, though, and the video that the Company produced corroborates that he did not make threats or use homophobic slurs. Moreover, the Motion erroneously claims that the incident took place in Revere. Motion at 5, ¶ 3. The video was taken in Peabody.

David Smith, a Republic employee based in Peabody and shop steward, remembers that Mr. Catano specifically advised picketers that they were not to use racial epithets or slurs when talking to the replacement drivers. Nonetheless, the Company alleges that Mr. Smith made homophobic statements to a replacement driver. He denies making any comments of the sort. Mr. Smith only recalls shaming the employee who was a fellow military veteran for stealing the jobs of other veterans. "You should be ashamed of yourself," he told her.

Local 25 Field Representative Eric Logan also vehemently denies making statements he is alleged to have made. On July 1, 2025, upon spotting Market Vice President Kurt Lavery, he shouted, "There's Kurt Lavery. Hey Kurt, why don't you come tell these guys [referring to Republic employees] what you said about them during negotiations?" He never threatened or directed threats at anyone. Mr. Logan also made certain picketers abided by Local 24's published "Instructions to Picketers.

### 4. The Remaining Claims Do Not Satisfy the Evidentiary Threshold to Require an Injunction.

What remains of Republic's Complaint against Local 25 is a series of alleged incidents and statements against unknown persons lacking a connection to Local 25. It is worth noting that what

17

is alleged would have occurred in front of police officers from five (5) different law enforcement agencies. Yet not a single arrest or citation has been made or issued in connection with the strike or the picketers' activity. There have been no arrests because the picture that Republic paints of the picketing is completely inaccurate.

To the extent there has been any conduct that has crossed the line, Local 25 has not been aware and certainly has never condoned or ratified the behavior. To the contrary, the Union's witnesses remember Mr. Catano making remarks to those on the picket lines that the Union prohibited them from using any sort of racial, homophobic, or threating language. Similarly, Mr. Logan testified that he checks in with police officers every day to ensure that there have been no disciplinary issues. In fact, Local 25 provided all strikers with instructions, forbidding this sort of misconduct. Aff. Catano, ¶ 12.

Because Republic fails to connect Local 25 officials to any unlawful conduct that allegedly occurred on the picket line, the Company's request for an injunction should be denied.

        **ii.**        **No Evidence of Substantial Irreparable Harm.**

Republic has failed to show that its property would be substantially and irreparably harmed if an injunction is not granted. Here, as noted above, there is no evidence to link Local 25 to the moving of the truck (which Republic admits was not damaged) or to any destruction of Republic's property.

        **iii.**       **An Injunction Would More Greatly Harm the Union.**

Granting an injunction in this case would harm the Union more than denying the injunction would harm Republic. By intervening in this labor dispute if an injunction is issued, this Court would be assisting Republic at the bargaining table by shifting public opinion against Local 25 and would hamper it's federally guaranteed right to negotiate a collective bargaining agreement. This

would harm the hundreds of employees involved in this strike. Meanwhile, there would be no harm to Republic if an injunction is not granted.

### iv. Republic Has Alternative Remedies.

Absent an injunction, Republic still has remedies available to it. To name just two (2); Republic can continue to sue for any damages it believes it suffered because of Local 25's alleged improper activity. It could file unfair labor practices against the Union for any conduct it believes violated the National Labor Relations Act.

### v. No Evidence that Police are Unable or Unwilling to Adequately Protect Republic's Property.

Finally, and most critically, Republic's request for an injunction must be denied because Republic has not and cannot show that police are unable or unwilling to protect their property. This assertion is belied by Republic's own affidavits. For example, Operations Manager Joseph Ganno states that on July 2, 2025 police successfully responded to a call for assistance. Further, all five (5) police departments have established rules to restrain certain improper behavior and to ensure that trucks and vehicles are able to move in and out the various republic facilities. That not one arrest has occurred over the eighteen (18) days and nights of picketing is evidence that police have complete control over picketing activities.

### vi. Republic is Unlikely to Succeed on the Merits of the Case.

Although not a statutory jurisdictional prerequisite for granting an injunction under the NLA, a requirement that Republic must prove to obtain an injunction in federal court is likely success on the merits. The interplay between the NLA and the causes of actions which Republic alleges in order to recover its damages make it exceedingly unlikely that Republic will succeed on the merits. The NLA requires an exacting clear and convincing standard of evidence before

vicarious liability can attach to the Union or any of its members. Here, that standard is obviously unable to be met. Therefore, Republic's request for an injunction should be denied.

## V. CONCLUSION

For these reasons, Republic's Motion for Temporary Restraining Order and Motion for Preliminary Injunction should be denied.

Respectfully submitted,<br>
**ON BEHALF OF THE DEFENDANTS,**<br>
<br>
By their attorney,<br>
<br>
**/s/ Nicholas S. Balatsos**<br>
Nicholas S. Balatsos, Esq.<br>
BBO # 708923<br>
Feinberg, Dumont & Brennan<br>
177 Milk Street, Suite 300<br>
Boston, MA 02109<br>
(617) 338-1976<br>
nsb@fdb-law.com

Dated: July 18, 2025

## CERTIFICATE OF SERVICE

I, Nicholas S. Balatsos, hereby certify that on this 18th day of July 2025 a true copy of the foregoing document was served on the below via email as follows:

Jillian S. Folger-Hartwell, Esq.
BBO # 658240
LITTLER MENDELSON P.C.
One Financial Plaza, Suite 2205
Providence, RI 02903
Telephone: 401.824.2500
Facsimile: 401.454.2969
jfolgerhartwell@littler.com

Dated: July 18, 2025                    **/s/ Nicholas S. Balatsos**